**Opinion filed July 24, 2025**



In The

# Eleventh Court of Appeals

_____

## No. 11-25-00046-CV

_____

## IN THE INTEREST OF Y.R. AND N.G., CHILDREN

**On Appeal from the 326th District Court**
**Taylor County, Texas**
**Trial Court Cause No. 11282-CX**

### M E M O R A N D U M   O P I N I O N

This is an accelerated appeal from the trial court's order terminating the parental rights of the mother and father to their children, Y.R. and N.G.[1]  Only the father, Appellant, appealed.  In four issues, Appellant challenges the trial court's denial of his request to extend the automatic dismissal date, the sufficiency of the evidence to support the trial court's findings that he endangered the children under Section 161.001(b)(1)(D) and (E) of the Texas Family Code, and the sufficiency of the evidence to support the trial court's finding that termination of his parental rights

---

[1]We use initials to refer to the children and their family members.  *See* TEX. R. APP. P. 9.8(b).

is in the children's best interest. *See* TEX. FAM. CODE ANN. §§ 161.001(b)(1)(D), (E), (b)(2), 263.401 (West Supp. 2024). We affirm the trial court's order.

*Termination Findings and Standards*

The termination of parental rights must be supported by clear and convincing evidence. FAM. § 161.001(b). To terminate one's parental rights, it must be shown by clear and convincing evidence that the parent has committed one of the acts listed in Section 161.001(b)(1)(A)–(V), and that termination is in the best interest of the children. *Id.* § 161.001(b)(2). Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007 (West 2019).

In this case, the trial court found that clear and convincing evidence established that Appellant committed at least one of the acts listed in Section 161.001(b)(1)—specifically, that Appellant: (1) knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endangered the physical or emotional well-being of the children pursuant to subsection (D); and (2) engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangered the physical or emotional well-being of the children under subsection (E). *See id.* § 161.001(b)(1)(D), (E). The trial court further found that termination of Appellant's parental rights was in the children's best interest. *See id.* § 161.001(b)(2).

In reviewing a legal sufficiency challenge, we must decide whether "a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.W.*, 645 S.W.3d 726, 741 (Tex. 2022). Cognizant of the required appellate deference to the factfinder, "we look at all the evidence in the light most favorable to the finding, assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so, and disregard all evidence that a

2

reasonable factfinder could have disbelieved or found to have been incredible." *Id.* (internal quotation marks omitted). "However, we may not disregard 'undisputed facts that do not support the finding,'" and the factfinder is "the sole arbiter of the witnesses' credibility and demeanor." *Id.* (quoting *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002); then quoting *In re J.F.-G.*, 627 S.W.3d 304, 312 (Tex. 2021)). As such, when considering the credibility of the evidence presented, we may not substitute our judgment for that of the factfinder. *J.F.-G.*, 627 S.W.3d at 316.

In assessing whether the evidence is factually sufficient, we weigh the disputed evidence that is contrary to the finding against all the evidence that favors the finding. *In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018). We give due deference to the finding and determine whether, on the entire record, a factfinder could reasonably form a firm belief or conviction about the truth of the allegations against the parent. *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009); *In re C.H.*, 89 S.W.3d 17, 25–26 (Tex. 2002); *In re L.C.C.*, 667 S.W.3d 510, 512 (Tex. App.—Eastland 2023, pet. denied).

With respect to the best interest of the children, no unique set of factors need be proved. *L.C.C.*, 667 S.W.3d at 513; *In re C.J.O.*, 325 S.W.3d 261, 266 (Tex. App.—Eastland 2010, pet. denied). Further, the best interest determination does not restrict the proof to any specific factor or factors. *In re J.S.*, 687 S.W.3d 541, 547 (Tex. App.—Eastland 2024, no pet.). However, courts may use the non-exhaustive *Holley* factors to shape their analysis. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). These include, but are not limited to: (1) the desires of the children; (2) the emotional and physical needs of the children now and in the future; (3) the emotional and physical danger to the children now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the best interest of the children; (6) the plans for the children by these individuals or by the agency seeking custody; (7) the stability of the home

or proposed placement; (8) the acts or omissions of the parent that may indicate the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Id.*

To support a best-interest finding, the Department is not required to prove each *Holley* factor; in some circumstances, evidence of the presence of only one factor will suffice. *C.H.*, 89 S.W.3d at 27; *In re D.M.*, 452 S.W.3d 462, 473 (Tex. App.—San Antonio 2014, no pet.). Additionally, the same evidence that proves one or more statutory grounds for termination may also constitute sufficient, probative evidence illustrating that termination is in the child's best interest. *C.H.*, 89 S.W.3d at 28; *C.J.O.*, 325 S.W.3d at 266.

The absence of evidence of some *Holley* considerations does not preclude the factfinder from reasonably inferring or forming a strong conviction or belief that termination is in the children's best interest, particularly if the evidence indicates that the parent-child relationship and the parent's conduct has endangered the safety and well-being of the children. *C.H.*, 89 S.W.3d at 27. This is so because the best interest analysis evaluates the best interest of the children, not the parent. *J.S.*, 687 S.W.3d at 548; *In re E.C.R.*, 638 S.W.3d 755, 767 (Tex. App.—Amarillo 2021, pet. denied) (citing *In re B.C.S.*, 479 S.W.3d 918, 927 (Tex. App.—El Paso 2015, no pet.)).

In this regard, the factfinder may measure a parent's future conduct by his or her past conduct in determining whether termination of the parent-child relationship is in the children's best interest. *J.S.*, 687 S.W.3d at 548; *In re Z.R.M.*, 665 S.W.3d 825, 829 (Tex. App.—San Antonio 2023, pet. denied); *In re D.S.*, 333 S.W.3d 379, 384 (Tex. App.—Amarillo 2011, no pet.). The factfinder may infer that a parent's past conduct that endangered the safety and well-being of the children may recur in the future if the children are returned to the possession of the parent. *In re J.D.*, 436 S.W.3d 105, 118 (Tex. App.—Houston [14th Dist.] 2014, no pet.); *May v. May*, 829

4

S.W.2d 373, 377 (Tex. App.—Corpus Christi–Edinburg 1992, writ denied). Additionally, the factfinder may infer from a parent's past inability to meet the children's physical and emotional needs an inability or unwillingness by the parent to meet the children's physical and emotional needs in the future. *J.D.*, 436 S.W.3d at 118; *see also In re A.S.*, No. 11-16-00293-CV, 2017 WL 1275614, at *3 (Tex. App.—Eastland Mar. 31, 2017, no pet.) (mem. op.).

*The Evidence Presented at Trial*

On December 13, 2023, two-year-old Y.R. and twenty-one-month-old N.G. were found wandering their apartment complex unsupervised. Responding officers with the Abilene Police Department learned that the children had been alone for several hours, and their mother, V.G., left them "unattended and walking around quite often." The neighbors also fed the children because "[V.G] didn't have anything to provide for [them]." An investigator for the Department of Family and Protective Services (the Department) spoke with V.G. when she arrived home. The Department's investigation revealed that V.G. was unemployed at the time, which led to her "doing things that weren't appropriate," such as engaging in prostitution, to provide for the children. Appellant had not contacted them "in quite some time because he was out in Colorado."

V.G. ultimately agreed that "[she] wasn't okay," and needed help caring for the children, so it was in their best interest to place them in the Department's care. The children were removed without a court order and the Department was granted temporary managing conservatorship the next day. *See* FAM. § 262.104. V.G. has since been diagnosed with post-traumatic stress disorder (PTSD), anxiety, and depression. She acknowledged that she "cannot provide what a parent should provide for their child," and voluntarily relinquished her parental rights.

Appellant was living with his sister in Denver when the children were removed, and did not have stable housing of his own. When Appellant was notified

5

of the pending suit, he publicly ridiculed V.G. on social media—he posted, for example, that "someone should strangle his ex baby momma," and added that she lived in Abilene. At the adversary hearing on December 20, the trial court ordered Appellant not to communicate with V.G. or make disparaging remarks or comments about the case on social media. Despite the court order, Appellant's posts continued. He referred to V.G. as a "nasty rat" and a "[d]umb hor [sic] [who] needs to go jump off a bridge," and complained that he "[g]ot blamed for this dumb rat[']s mistakes." In another post, he criticized the trial court and undermined the ongoing case: "They will still find[] [a] way to blame me . . . these crackers[] [j]ust on my page. Can't express none of my feelings[] [c]ause what this rat did. Got me in the mix too."

Prior to removal, Appellant had not seen his children since February 2022. Appellant and V.G. began dating in 2020 when he was twenty-five and she was sixteen. V.G. got pregnant with Y.R. days after her seventeenth birthday, then went to live with Appellant in his mother's home in Colorado. According to V.G., Appellant used and sold marihuana throughout their relationship, and smoked marihuana around Y.R. after she was born in March 2021. V.G. also described Appellant's abuse; on one occasion during her pregnancy with Y.R., she begged Appellant to stop selling marihuana. In response, Appellant pushed V.G. so hard that she "ended up on the side of the bed on the floor."

The family moved to Oklahoma after Y.R. was born, and V.G. learned that she was pregnant with N.G. While living in Oklahoma, Appellant slapped V.G., and on a separate occasion he struck her with such force that she "black[ed] out" then "woke up with blood on [her] temple." V.G. also recalled Appellant knocking over Y.R.'s highchair while the child was sitting in it. V.G. moved back to Texas with Y.R. and subsequently ended the relationship with Appellant just before giving birth to N.G. in March 2022.

After their relationship ended, Appellant began threatening V.G. and anyone she dated, and repeatedly called her names such as "a tramp," "no good for nothing," and "a whore." V.G. briefly dated an old friend upon her return to Texas, but parted ways because Appellant "would consistently blow [his] phone up with threats." Appellant, by contrast, attributed the animosity to V.G.'s significant other, who allegedly attacked him when he traveled to Houston before N.G. was born.

Appellant returned to Colorado in April 2022, and had minimal contact with his children for the next one and one-half years. He gave V.G. $100 once, but otherwise ignored her pleas for financial aid, and "consistently told [her] that those are not [his] kids." V.G. struggled to provide for the children without Appellant's financial support. She worked at Sonic and also as an exotic dancer when she "needed quick and easy cash to provide for the kids," and eventually performed sexual acts for money.

V.G. nevertheless sought to cultivate a bond between Appellant and the children, but felt like she "was hitting a brick wall." Before one planned visit, "he ended up changing his mind" and "was a no-show." V.G. counted only three phone calls between Appellant and the children, and "had to fight tooth and nail to get [Appellant] to answer the phone." Appellant insisted that V.G. withheld the children from him, but later confirmed "talk[ing] with [his] babies" on a Zoom call prior to the Department's involvement.

Appellant moved to Texas in April 2024, but returned to Colorado two months later. He worked in Aspen where he "was staying at employee housing . . . for a little bit," and in Colorado Springs, and Grand Junction. Because he represented that his mother's home was his permanent residence, the Colorado Department of Human Services (DHS) evaluated the home as a potential placement for the children. The Colorado DHS caseworker who interviewed Appellant observed that he "struggled to be honest," and may have mental health issues "based on his demeanor,

7

presentation, and information provided in his three different interviews." During the first interview, Appellant represented that he did not "speak negatively or badly about [V.G.] even though he is frustrated with her behavior and how she harmed the kids." Five days later, the caseworker saw Appellant's Facebook posts "insulting or wishing harm upon [V.G.]" When confronted about the posts during the second interview, Appellant "deflected by asking [the caseworker] if she was able to understand anything [he] said or if she was stupid." During his second interview, Appellant "became very upset," "was very difficult to follow, spoke very quickly, and did not always make sense." He also disclosed "that he did not actually want to stay in Grand Junction." Finally, Appellant accused V.G. of physically abusing him, despite his initial denial of "any past issues of violence in his relationship with [V.G.]"

Colorado DHS recommended against placing the children in the Grand Junction home with Appellant. In addition to "concerns with safety regarding [Appellant's] mental health," the caseworker noted that "[i]t is not clear how [Appellant's] current lifestyle will be realistically adapted if the children return to him . . . he was not honest about his desire to stay in Grand Junction, and in fact wants to move . . . somewhere else."

Appellant also exhibited aggression toward his assigned caseworker in Texas, Jennifer Boals, who observed that Appellant had "a short fuse, a temper, and he will lash out." Boals also saw hostile messages that Appellant sent to V.G. The counseling required by Appellant's family plan of service was intended to address Appellant's dishonesty, ability to handle conflict, and domestic violence concerns. However, he stopped participating in counseling in June 2024 and was "very reluctant to comply" with his other requirements.

The trial court held the final termination hearing over three days: December 11, 2024, January 14, 2025, and February 11, 2025. On December 10,

Appellant filed a motion to appear remotely for the hearing. When all parties except Appellant appeared the next day, his attorney requested an extension of the dismissal deadline for Appellant to attend anger management classes that were ordered by the trial court on September 23, 2024. *See* FAM. § 263.401(b). The trial court denied Appellant's motion and extension request, and commenced trial on the merits.

Boals testified that the children were placed with their maternal great aunt, in March 2024. The children "constantly play[ed] with [their aunt]" and were "very well bonded." Both children were significantly developmentally delayed. They each needed speech therapy and play therapy, and N.G. was receiving developmental therapy to help him walk. Y.R. was also being treated for Pica and enuresis. Boals described the aunt's home as "a long-term option" because the aunt was meeting the children's needs and intended to adopt them. V.G. reiterated that the aunt, who helped raise her, would provide "a stable household" for the children that is "[d]rug-free" and "[a]lcohol-free."

The Department posited that it was in the children's best interest to terminate Appellant's parental rights. Boals opined that Appellant had not demonstrated the ability to maintain safe, stable housing. Additionally, Appellant's difficulty and reluctance to complete his own services gave the Department concerns regarding his ability to meet the elevated therapeutic needs of the children. Appellant's frequent changes in employment also caused the Department concern; he has had "blue-collar jobs" in Denver, Aspen, and Grand Junction, and "some employment" in Texas. In February 2025, he had been working at Panda Express in Grand Junction for less than a month. Appellant did not perceive his working habits as concerning: "Why is it being frowned upon that I did that, you know, made some money?" He eventually acknowledged that he "live[s] a nomadic lifestyle," but asserted that he was "going to stay in Grand Junction."

9

The Department called Appellant as its third and final witness on the last day of trial, who disputed most of the evidence presented. He denied telling the Colorado caseworker that he was going to leave Grand Junction, and said "[s]he made a false statement about that." Appellant agreed that he "live[d] a nomadic lifestyle," but said "that will definitely change when [he] [has] any kids." Appellant also denied any domestic violence, then claimed V.G. was the sole perpetrator. Appellant remembered V.G.'s and Y.R.'s move to Texas as his idea, and the way in which he "tried to get out of" the tumultuous relationship. Despite sending his pregnant girlfriend and child to live in another state, Appellant purportedly "tried [his] best" not to leave his children with V.G. He testified that he "couldn't do nothing about it" after V.G.'s first boyfriend allegedly threatened "to beat [him] up for months," and attacked him in front of Y.R. Appellant conceded that he did not report the alleged assault to law enforcement or the Department, but "definitely tried" to call an attorney and initiate a custody suit. He complained that "it's not an easy process . . . [he] made calls and stuff like that," but "had no luck." Ultimately, he became defensive and again blamed V.G.: "[S]he made that decision to be with that guy. I couldn't do nothing."

Appellant testified that he used marihuana "like, once a week," but committed to keeping it away from the children if they lived with him. And when confronted about his social media activity, Appellant stated that he "was just trying to protect [his] daughter" and they were "taken out of context." He then admitted: "I was frustrated at the time and everything, and it looks bad I know. I apologize for that, you know. But . . . it was just very frustrating at the moment."

At the conclusion of the hearing, the trial court terminated Appellant's parental rights under Section 161.001(b)(1)(D) and (E), and found termination to be in the best interest of the children. *See* FAM. § 161.0001(b)(1)(D), (E), (b)(2). This appeal followed.

10

*Section 161.001(b)(1)(D) and (E) – Endangerment*

In his first and second issues, Appellant challenges the trial court's findings that he endangered Y.R. and N.G. as set forth in Sections 161.001(b)(1)(D) and (E). Although only one statutory ground is necessary to support termination, appellate courts must address a parent's challenges to a trial court's findings under subsections (D) or (E), as they may have implications for the parent's rights to other children. *See* FAM. § 161.001(b)(1)(M); *In re N.G.*, 577 S.W.3d 230, 234–35 (Tex. 2019) (addressing due process and due course of law considerations with respect to appellate review of grounds (D) and (E) and holding that an appellate court must provide a detailed analysis if affirming the termination on either ground). Thus, if we conclude that the evidence is legally and factually sufficient to uphold the trial court's finding as to either subsection (D) or (E), we need not address the remaining subsections. *See* FAM. § 161.001(b)(1); TEX. R. APP. P. 47.1. And when the evidence pertaining to both subsections (D) and (E) is interrelated, as it is here, we may conduct a consolidated review of the trial court's endangerment findings. *See In re A.L.S.*, 660 S.W.3d 257, 263–64 (Tex. App.—San Antonio 2022, pet. denied); *In re J.D.*, 436 S.W.3d 105, 114 (Tex. App.—Houston [14th Dist.] 2014, no pet.); *In re M.R.J.M.*, 280 S.W.3d 494, 503 (Tex. App.—Fort Worth 2009, no pet.).

The statutory endangerment grounds require clear and convincing proof that the parent has: "(D) knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child," or "(E) engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." FAM. § 161.001(b)(1)(D), (E); *In re S.M.R.*, 434 S.W.3d 576, 585 (Tex. 2014). "[E]ndangerment encompasses a larger array of conduct that 'expose[s a child] to loss or injury' or 'jeopardize[s]' the child." *In re R.R.A.*, 687 S.W.3d 269, 277 (Tex. 2024) (quoting *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533

11

(Tex. 1987)).  The term means "more than a threat of metaphysical injury or potential ill effects of a less-than-ideal family environment," but does not require actual harm. *In re E.N.C.*, 384 S.W.3d 796, 803 (Tex. 2012); *see R.R.A.*, 687 S.W.3d at 277 (citing *Boyd*, 727 S.W.2d at 533).

To terminate a parent's rights for endangerment under subsections (D) or (E), the "parent's endangering conduct need not 'be directed at the child or that the child actually suffers injury.'"  *R.R.A.*, 687 S.W.3d at 277 (quoting *Boyd*, 727 S.W.2d at 533); *In re C.E.*, 687 S.W.3d 304, 310 (Tex. 2024).  "[T]ermination under [subsection] (D) requires that the child's environment is a source of endangerment, and the parent's conduct may create that dangerous environment."  *C.E.*, 687 S.W.3d at 310.  "A parent's drug use, violence, or other abuse may make the child's environment endangering to the child."  *In re J.S.*, 675 S.W.3d 120, 128 (Tex. App.—Dallas 2023, no pet.).  "A parent acts 'knowingly' when the parent is aware that the environment creates a potential danger to the child but the parent disregards that risk."  *Id.*  Because conditions or surroundings cannot endanger children unless the children are exposed thereto, the relevant time frame for evaluating subsection (D) is before the children's removal.  *J.W.*, 645 S.W.3d at 749.

Endangerment under subsection (E), in contrast, focuses on the parent's conduct, and whether the endangerment of the children's well-being was the direct result of the parent's acts, omissions, or failures to act.  *In re J.S.*, 687 S.W.3d 541, 550 (Tex. App.—Eastland 2024, no pet.).  Termination under subsection (E) must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required.  *J.S.*, 687 S.W.3d at 550; *In re D.T.*, 34 S.W.3d 625, 634 (Tex. App.—Fort Worth 2000, pet. denied).  "A factfinder may infer endangerment from 'a course of conduct' that presents substantial risks to the child's physical or emotional well-being."  *R.R.A.*, 687 S.W.3d at 277.  A parent's actions prior to and after the children's removal may

12

show an endangering course of conduct. *See J.S.*, 687 S.W.3d at 550 ("[E]ndangering conduct may include a parent's actions before the child's birth and may relate to the parent's actions while the parent had possession of other children."). "Even evidence of criminal conduct, convictions, and imprisonment prior to the birth of a child will support a finding that a parent engaged in a course of conduct that endangered the child's well-being." *In re A.J.M.*, 375 S.W.3d 599, 606 (Tex. App.—Fort Worth 2012, pet. denied); *Walker v. Tex. Dep't of Fam. & Protective Servs.*, 312 S.W.3d 608, 617 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) (Illegal drug use and offenses that occurred before the child's birth may be considered as part of a course of conduct that endangers a child.).

V.G.'s testimony alone, which the trial court was entitled to credit, established that Appellant engaged in endangering conduct and knowingly allowed the children to remain in an endangering environment. *See J.F.-G.*, 627 S.W.3d at 311–12; *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). V.G. provided detailed accounts of Appellant's abuse on several occasions, including knocking over Y.R.'s highchair while she was sitting in it. *See In re D.J.W.*, 624 S.W.3d 60, 67 (Tex. App.—El Paso 2021, no pet.) ("[D]omestic violence may support a finding of either environment or course-of-conduct endangerment."). In addition to the physical abuse, Appellant verbally abused V.G. and anyone with whom she was romantically involved. One of V.G.'s relationships ended because Appellant "would consistently blow [that] person's phone up with threats" and demeaning insults about V.G. Appellant's threatening messages persisted throughout the case—V.G. testified that Appellant threatened to kill her current boyfriend and his children. She expressed justifiable concern that "if [Appellant] can make threats to somebody else's kids," his aggression posed a substantial risk to Y.R. and N.G. Appellant's "[i]nappropriate, abusive, [and] unlawful conduct" supports the trial court's endangerment findings. *See In re J.D.B.*, 435 S.W.3d 452, 464 (Tex. App.—Dallas 2014, no pet.); *see also*

*J.O.A.*, 283 S.W.3d at 345 (Endangering conduct may include the parent's actions occurring before the child's birth, including evidence of drug use and drug-related criminal activity.); *In re R.S.-T.*, 522 S.W.3d 92, 110 (Tex. App.—San Antonio 2017, no pet.) ("Domestic violence, want of self-control, and propensity for violence may be considered as evidence of endangerment." (quoting *In re J.I.T.P.*, 99 S.W.3d 841, 845 (Tex. App.—Houston [14th Dist.] 2003, no pet.))).

The trial court also heard that Appellant sold marihuana, smoked marihuana around V.G. during both pregnancies, and exposed Y.R. to marihuana by "hotbox[ing]" their apartment. V.G. suspected that Appellant was a gang member "due to the drug deals he [would] do . . . where there were pounds and pounds of mari[h]uana and multiple . . . burner phones." Under Colorado law, personal marihuana use and possession of up to one ounce is legal for persons twenty-one years of age or older. COLO. CONST. art. XVIII, § 16(3). But in Oklahoma and Texas, possessing marihuana without a state-issued medical marihuana license is illegal. *See* OKL. STAT. ANN. tit. 63, §§ 2-402, 2-204(C)(12); TEX. HEALTH & SAFETY CODE ANN. § 481.121 (West Supp. 2024); TEX. OCC. CODE ANN. §§ 169.001–.005 (West 2022) (Authority to Prescribe Low-THC Cannabis to Certain Patients for Compassionate Use). V.G.'s testimony permits the rational inference that Appellant illegally possessed marihuana while they were living in Oklahoma, and illegally possessed and distributed more than legally allowed in Colorado. This evidence of Appellant's criminal conduct that could have resulted in his incarceration is relevant to the endangerment analysis. *J.F.-G.*, 627 S.W.3d at 315–17.

Irrespective of the legality of marihuana use or possession, drug use and its effects on the parent's life and ability to parent may demonstrate an endangering course of conduct. *J.O.A.*, 283 S.W.3d at 345; *In re K.-A.B.M.*, 551 S.W.3d 275, 286 (Tex. App.—El Paso 2018, no pet.); *In re R.F.*, No. 11-24-00271-CV, 2025

WL 994024, at *8 (Tex. App.—Eastland Apr. 3, 2025, pet. denied) (mem. op.) (citing *J.S.*, 687 S.W.3d at 550 ("Evidence of endangerment is demonstrated in many forms, including . . . alcohol and drug abuse.")). That is because any drug activity or substance abuse—legal or illegal—may render the parent incapable of parenting. *J.S.*, 687 S.W.3d at 550, 554 (citing *R.R.A.*, 687 S.W.3d at 278). On this record, the trial court could have formed a firm conviction or belief that both children were exposed to marihuana in utero through Appellant's use, which contributed to the children's endangering environment. *See In re J.W.*, 645 S.W.3d 726, 749–50 (Tex. 2022) ("[A] parent's knowledge of the other parent's drug use during pregnancy and corresponding failure to attempt to protect the unborn child from the effects of that drug use can contribute to an endangering environment.").

To cast himself as the "non-offending parent," Appellant clings to his absence for most of the children's lives. It is undisputed that the children were endangered while in V.G.'s care. They were frequently left unsupervised and had to seek proper care and nutrition from neighbors. They were exposed to illegal drugs, as evidenced by N.G. testing positive for methamphetamine after removal. Meanwhile, Appellant provided no meaningful financial or emotional support for his children. He never visited the children in Texas after N.G. was born, had only a few phone or video calls with them, and provided no meaningful financial support. Appellant's choice not to monitor the children's safety while living apart, his minimal effort to contact the children or be part of decisions regarding their health or well-being, and lack of financial assistance are omissions that exposed the children to physical and emotional loss. *See In re N.L.S.*, No. 23-0965, 2025 WL 1687924, at *4–5 (Tex. June 13, 2025) (citing *J.F.-G.*, 627 S.W.3d at 315).

Appellant likewise ignores the well-established law that failing to remove a child from an endangering environment can support termination under subsection (D) if the parent is aware of the dangerous conditions or surroundings. *See J.G. v.*

15

*Tex. Dep't of Fam. & Protective Servs.*, 592 S.W.3d 515, 524 (Tex. App.—Austin 2019, no pet.); *In re A.L.H.*, 468 S.W.3d 738, 746 (Tex. App.—Houston [14th Dist.] 2015, no pet.). Amid Appellant's contradictions was his unwavering derision for V.G., whom he repeatedly portrayed as a hysterical, violent, mentally ill "nasty rat" and "[d]umb [w]hor[e]" who "scream[ed] at the kids all day." But Appellant's vilification of V.G. and simultaneous decision to leave the children in her care belies his attempt to elude culpability. Instead, Appellant's characterization of V.G. as violent substantiates that he knowingly subjected the children to a life of uncertainty and instability that endangered their well-being. *See In re M.S.*, 662 S.W.3d 620, 630–31 (Tex. App.—Beaumont 2023, pet. denied) (In addition to "domestic violence concerns," the father left his children with the mother "when he knew something was wrong with her."); *In re K.G.*, No. 11-24-00236-CV, 2025 WL 477650, at *5–6 (Tex. App.—Eastland Feb. 13, 2025, no pet.) (mem. op.) ("A parent's decision to leave a child in the care of a known drug user subjects the child to a life of uncertainty and instability that endangers the child's physical and emotional well-being."); *E.G. v. Tex. Dep't of Fam. & Protective Servs.*, No. 03-22-00469-CV, 2022 WL 17970222, at *9 (Tex. App.—Austin Dec. 28, 2022, no pet.) (mem. op.) (The father endangered the child by leaving the child with the mother, whom he knew to be a methamphetamine user.).

Based on the foregoing, the evidence is sufficiently clear and convincing such that a reasonable factfinder could have formed a firm conviction or belief that Appellant disregarded his parental obligations to the degree that he knowingly allowed the children to remain in an endangering environment and "knowingly placed [the children] with persons who engaged in [endangering] conduct." FAM. § 161.001(b)(1)(D), (E); *see J.W.*, 645 S.W.3d at 750.

Accordingly, we overrule Appellant's first and second issues.

*Best Interest of the Children*

In his fourth issue, Appellant challenges the legal and factual sufficiency of the evidence to support the trial court's finding that termination of his parental rights is in the best interest of the children. "'[B]est interest' is a term of art encompassing a much broader, facts-and-circumstances based evaluation that is accorded significant discretion." *In re Lee*, 411 S.W.3d 445, 460 (Tex. 2013) (quoting *Holley*, 544 S.W.2d at 371–72). We reiterate that the trial court, as the trier of fact, is the sole judge of the witnesses' credibility. *J.F.-G.*, 627 S.W.3d at 312. We are not at liberty to disturb the determinations of the factfinder so long as those determinations are not unreasonable. *Id.* at 311–12; *J.P.B.*, 180 S.W.3d at 573. Giving the requisite due deference to the trial court, we hold that, based on the evidence in the record and the application of the *Holley* factors, the trial court could have formed a firm belief or conviction that termination of Appellant's parental rights was in the best interest of the children. *See Holley*, 544 S.W.2d at 371–72.

Evidence of each *Holley* factor is not required to support a best-interest finding. *In re S.R.*, 452 S.W.3d 351, 366 (Tex. App.—Houston [14th Dist.] 2014, pet. denied); *In re S.O.*, No. 05-22-01019-CV, 2023 WL 2237084, at *11 (Tex. App.—Dallas Feb. 27, 2023, no pet.) (mem. op.). In other words, the absence of evidence regarding some of these factors does not preclude a best-interest finding, "particularly if [the] undisputed evidence shows the parental relationship endangered the child's safety." *In re N.T.*, 474 S.W.3d 465, 477 (Tex. App.—Dallas 2015, no pet.). Consequently, "evidence relating to one single factor may be adequate in a particular situation to support a finding that termination is in the best interests of the child." *J.S.*, 687 S.W.3d at 552 (quoting *In re K.S.*, 420 S.W.3d 852, 855 (Tex. App.—Texarkana 2014, no pet.)). And evidence that is relevant to Section 161.001(b)(1) termination grounds may be probative of the child's best interest. *See E.C.R.*, 402 S.W.3d at 249–50 (citing *C.H.*, 89 S.W.3d at 28).

The clear and convincing evidence that Appellant endangered the children also established that terminating his parental rights was in the children's best interest. Significantly, Appellant exposed the children to domestic violence and marihuana use, which posed infinite potential dangers to the children and "implicates most of the *Holley* factors." *In re E.D.*, 682 S.W.3d 595, 607 (Tex. App.—Houston [1st Dist.] 2023, pet. denied); *In re O.E.R.*, 573 S.W.3d 896, 905 (Tex. App.—El Paso 2019, no pet.) ("Physical violence in the home leads to an unstable and unpredictable environment for children."); *K.G.*, 2025 WL 477650, at \*5. At the time of trial, Appellant still used marihuana "for anxiety," and expressed no intent to stop. Legal or not, a parent's continuing pattern of drug use can support a best-interest finding due to the "attendant risks to employment, housing, and prolonged absence from the children." *R.R.A.*, 687 S.W.3d at 281.

Here, such risks were reality: Appellant never secured and maintained his own stable housing, he cycled through short-term jobs, and abandoned his children for nearly eighteen months. *See J.W.*, 645 S.W.3d at 742 (considering the parent's unstable and uncertain living situation in upholding the trial court's best-interest finding). During Appellant's prolonged absence from his children, he failed to ensure that they were adequately cared for, supported, and protected. *See In re E.P.C.*, 381 S.W.3d 670, 683–84 (Tex. App.—Fort Worth 2012, no pet.) (The parent's failure to provide proper nutrition, leaving the child alone, and his lack of remorse for doing so was evidence of endangerment.). Even after removal he made no monetary contributions to assist with or provide for his children's upbringing. And Appellant's transience, which he attributed to his desire not to be "landlocked," suggests an unwillingness to achieve the permanence and stability that his young children need to thrive. *See In re J.A.R.*, 696 S.W.3d 245, 257 (Tex. App.—Houston [14th Dist.] 2024, pet. denied) ("Stability and permanence are paramount in the upbringing of children."). "The trial court could have rationally inferred that

relinquishing the children to Appellant's care would subject them to a life of uncertainty and instability, which is contrary to their best interest." *See In re E.M.*, No. 11-24-00310-CV, 2025 WL 1240792, at *10 (Tex. App.—Eastland Apr. 30, 2025, no pet.) (mem. op.) (citing *In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied)).

Rather than recognizing his role in the children's instability and eventual removal, Appellant reacted defensively and aggrieved. He ignored the evidence of his aggression and obstinance that undermined his professed composure and diplomacy, and imputed fault to Boals, the Colorado caseworker, and V.G. for the circumstances. Appellant also insisted that counseling was unnecessary, and deflected scrutiny for his nomadic lifestyle and for leaving the children. The trial court could consider Appellant's minimization of culpability, his failure to truly avail himself of the programs to assist him in promoting the best interest of the children, and his failure to properly address his mental health issues other than with recreational marihuana use. *See Holley*, 544 S.W.2d at 371–72; *In re E.G.*, 643 S.W.3d 236, 254 (Tex. App.—Amarillo 2022, no pet.) ("Mother's untreated mental health issues gave way to behavior that resulted in [the child's] removal and constituted conduct that endangered [the child's] physical and emotional well-being."); *In re A.H.*, No.11-24-00075-CV, 2024 WL 3879987, at *7 (Tex. App.—Eastland Aug. 21, 2024, pet. denied) (mem. op.) ("[Mother's] past behavior, minimization of her conduct, drug use . . . and failure to properly address and treat her mental health issues[] permit the rational conclusion that relinquishing [the child] to her care would pose a substantial risk of harm to the child.").

Appellant acknowledged sending V.G. aggressive messages in the past—such as threatening to "strip [V.G.] from [her] life"—and showed half-hearted contrition for posting "very strong words" about V.G. in violation of the trial court's order. He then attempted to justify his social media activity:

I was really hurt. . . . [T]hat was really tough on me, and . . . I was emotional at the time. . . . [T]his whole case, everything that happened. I was in the middle of all this.

Appellant's testimony is irreconcilable with his years of past behavior, including his abandonment of the children. Such "evidence of parental indifference weighs heavily in favor of a factfinder's finding that termination is in [the children's] best interest." *In re A.J.D.-J.*, 667 S.W.3d 813, 823 (Tex. App.—Houston [1st Dist.] 2023, no pet.); *see also A.H.*, 2024 WL 3879987, at *6 ("Appellant broadcasted the father's ongoing aggression and violence on social media, rather than attempting to protect [the child] from it.").

Most importantly, given the child-centered focus of the best-interest inquiry, we may not discount the children's improvement in the care of their aunt, who hopes to adopt them. *See J.W.*, 645 S.W.3d at 746–47. When children are too young to express their desires, the factfinder may consider whether the children have bonded with their caregivers, are well-cared for by them, and whether the children have spent minimal time with a parent. *In re E.J.M.*, 673 S.W.3d 310, 334 (Tex. App.—San Antonio 2023, no pet.); *see also In re N.J.H.*, 575 S.W.3d 822, 834 (Tex. App.—Houston [1st Dist.] 2018, pet. denied) (stating that evidence showing that a young child had bonded with foster family supported best-interest finding). Here, the children "are doing great" and have formed a "[v]ery strong" bond with their aunt and her husband, who have given the children a safe, stable home environment. She is addressing the children's medical and therapy needs that are vital to their recovery and continued improvement. *See In re M.C.L.*, No. 04-21-00277-CV, 2022 WL 219002, at *6 (Tex. App.—San Antonio Jan. 26, 2022, no pet.) (mem. op.) (It is in the child's best interest to be with a foster family that "has been attentive to meet [the child's] needs."). Therefore, the plans for the children, especially considering their diminished bond with Appellant, further supports the trial court's best-interest finding. *See Holley*, 544 S.W.2d at 371–72.

20

Upon considering the evidence as it relates to Appellant's actions and inactions, the emotional and physical danger to the children now and in the future, the emotional and physical needs of the children now and in the future, Appellant's lack of parental abilities and stability, and his past conduct (namely, his drug use, lack of a stable home environment, and his abandonment of, lack of concern for, and failure to support the children), we hold that the evidence is legally and factually sufficient to support the trial court's finding that termination of Appellant's parental rights is in the best interest of the children.  *See J.W.*, 645 S.W.3d at 741; *Holley*, 544 S.W.2d at 371–72.

Accordingly, we overrule Appellant's fourth issue.

*Section 263.401 – Denial of Extension of Automatic Dismissal Date*

Appellant contends in his third issue that the trial court abused its discretion by denying his request to extend the automatic dismissal date under Section 263.401(b) of the Texas Family Code.

The legislature enacted Section 263.401 to encourage the prompt resolution of suits in which the Department seeks to terminate the parent-child relationship.  *In re G.X.H.*, 627 S.W.3d 288, 292 (Tex. 2021).  In that regard, in a parental termination proceeding, a trial on the merits must commence by "the first Monday after the first anniversary of the date the court rendered a temporary order appointing the department as temporary managing conservator."  FAM. § 263.401(a).  The failure to do so without a valid extension under subsection (b) deprives the trial court of jurisdiction over the suit, and results in its automatic dismissal.  *Id.*

Section 263.401(b) permits the trial court to retain the suit on its docket only if the trial court finds that: (1) "extraordinary circumstances necessitate the child remaining in the temporary managing conservatorship of the [D]epartment"; and (2) "continuing the appointment of the [D]epartment as temporary managing conservator is in the best interest of the child."  *Id.* § 263.401(b).  When determining

21

whether an extension is justified by extraordinary circumstances and is in the best interest of the child, the focus is necessarily on the needs of the child. *In re A.B.*, No. 11-24-00206-CV, 2025 WL 409053, at *8 (Tex. App.—Eastland Feb. 6, 2025, pet. denied) (mem. op.). We review a trial court's decision to grant or deny an extension requested under Section 263.401(b) for an abuse of discretion. *In re X.M.B.E.*, 706 S.W.3d 714, 721 (Tex. App.—Eastland 2025, no pet.).

Actions that are caused by or considered to be the parent's fault will generally not constitute extraordinary circumstances. *X.M.B.E.*, 706 S.W.3d at 721 (citing *In re M.S.*, 602 S.W.3d 676, 680 (Tex. App.—Texarkana 2020, no pet.) (The mother's confinement was the result of her actions and was not an extraordinary circumstance.)). "[P]arents cannot blunder their way into extraordinary circumstances." *In re C.G.*, No. 02-20-00087-CV, 2020 WL 4518590, at *3 (Tex. App.—Fort Worth Aug. 6, 2020, pet. denied) (mem. op.). For example, if a parent, by choice, fails to comply with a service plan and then moves to extend the statutory dismissal date to complete the plan's requirements, the trial court will not abuse its discretion if it denies the parent's extension request. *X.M.B.E.*, 706 S.W.3d at 721 (citing *S.B. v. Tex. Dep't of Fam. & Protective Servs.*, No. 03-22-00476-CV, 2023 WL 402206, at *3 (Tex. App.—Austin Jan. 26, 2023, no pet.) (mem. op.)); *see also In re Y.G.*, No. 01-22-00181-CV, 2022 WL 3362953, at *9 (Tex. App.—Houston [1st Dist.] Aug. 16, 2022, no pet.) (mem. op.); *In re J.M.*, No. 02-21-00346-CV, 2022 WL 872542, at *4 (Tex. App.—Fort Worth Mar. 24, 2022, no pet.) (mem. op.) ("Father's inability to complete services because of and after his incarceration was the consequence of his own actions," and thus was not an extraordinary circumstance.).

On appeal, Appellant asserts that "he had substantially completed his court[-]ordered services,[2] but could benefit from an extension . . . to complete the services and request the children be placed with him." *See* FAM. § 263.401(b). Appellant urged the trial court to extend the dismissal date because he had insufficient time to complete his court-ordered anger management classes. The Department's attorney advised that "[r]eferrals have been made, and services have been offered in both Texas and Colorado," but Appellant "has not taken much initiative in getting services started and completed timely." Although the Department was "willing to . . . continue to work with [Appellant] trying to set up services," the Department's attorney "[didn't] see much of a change occurring with [an] extension . . . the facts would remain relatively the same." The children's attorney ad litem opposed an extension because "[t]he children [were] in their intended-to-be permanent placement," and she had "concerns about [Appellant's] ability to care for them [and] provide for them."

"[A] trial court does not abuse its discretion by denying an extension motion that is unsupported by evidence of extraordinary circumstances." *J.M.*, 2022 WL 872542, at *4. Appellant simply asked the trial court for additional time without offering any evidence to demonstrate the existence of extraordinary circumstances or that an extension was in the best interest of the children. Even considering Appellant's attorney's unobjected-to factual assertions, there was no suggestion that Appellant made any effort whatsoever to begin his required classes in the preceding three months. *See* FAM. § 263.401(b-3) (mandatory finding of extraordinary circumstances upon a showing that the parent "has made a good faith effort to

---

[2]We note for clarity that Appellant appears to conflate the statutory prerequisites of Section 263.401(b) with other provisions of the Family Code. Substantial compliance with his service plan and culpability for any delay are relevant considerations under the affirmative defense to termination under subsection (O). *See* FAM. § 161.001(d). That is not to say that they are wholly irrelevant to the extraordinary-circumstances determination under Section 263.401(b); only that they are not expressly designated criteria for extending the dismissal date. *See id.* § 263.401(b).

successfully complete the service plan but needs additional time," and the trial court "intends to order the child returned to the parent" upon completion of the service plan). Because Appellant's extension request failed to establish the existence of extraordinary circumstances and it overlooked the best interest of his children, it was insufficient to justify an extension under Section 263.401(b). *See Y.G.*, 2022 WL 3362953, at *9.

Appellant contends that the trial court also erred "by finding the Department made reasonable efforts to place the children with [Appellant]." He criticizes the Department for its lag in arranging the Colorado home study, but concedes responsibility for "some of the delay." First, Section 263.401(b) does not explicitly require the trial court to consider the Department's reasonable efforts to return a child to a parent. *See* FAM. § 263.401(b). Rather, the Department's reasonable efforts to return a child to a parent are a prerequisite to terminating the parent-child relationship. *See id.* §§ 161.001(b)(1)(N), 161.001(f), (g). Second, Appellant did not raise this argument to the trial court in support of his extension request. *See id.* § 263.401(b). We generally may not evaluate a trial court's rulings based on information not before it at the time it ruled. *See Lebron v. Citicorp. Vendor Fin., Inc.*, 99 S.W.3d 676, 679 (Tex. App.—Eastland 2003, no pet.); *Methodist Hosps. of Dallas v. Tall*, 972 S.W.2d 894, 898 (Tex. App.—Corpus Christi–Edinburg 1998, no pet.) ("It is axiomatic that an appellate court reviews actions of a trial court based on the materials before it at the time it acted."). Even so, it is undisputed that the protracted timeline is partially attributable to Appellant, a self-proclaimed "frequent traveler" who "does not want to stay in one place." The trial court could thus have reasonably determined that any impediment to Appellant completing his services was a result of his decision to live outside of Texas. *See S.B.*, 2023 WL 402206, at *3; *cf. X.M.B.E.*, 706 S.W.3d at 724–25 (extension should have been granted after the mother "'had to flee to Oklahoma' after being assaulted by the father"). We

24

therefore conclude that the trial court did not abuse its discretion by denying Appellant's request for an extension.

Finally, Appellant failed to demonstrate that he was harmed by the trial court's denial of his request to extend the automatic dismissal deadline. An error warrants reversal when it either "probably caused the rendition of an improper judgment" or "prevented the appellant from properly presenting the case to the court of appeals." TEX. R. APP. P. 44.1; *R.F.*, 2025 WL 994024, at *5. The reviewing court must evaluate the potential influence or impact of the alleged error on the trial court's final judgment. *In re J.N.*, 670 S.W.3d 614, 619 (Tex. 2023). Here, Appellant began his anger management classes on January 13, 2025, and his last class was February 10, the day before the final hearing concluded. Further, the trial court did not terminate his parental rights pursuant to subsection (O). On this record, Appellant suffered no harm from the trial court's denial of his extension request for additional time to complete his services.

Accordingly, we overrule Appellant's third issue.

*This Court's Ruling*

We affirm the order of the trial court.


JOHN M. BAILEY
CHIEF JUSTICE


July 24, 2025

Panel consists of: Bailey, C.J.,
Trotter, J., and Williams, J.

25